**Opinion issued February 13, 2024**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-23-00623-CV

————————————

## IN THE INTEREST OF L.R.D. AND K.A.M., Children

---

**On Appeal from the 247th District Court**
**Harris County, Texas**
**Trial Court Case No. 2014-68273**

---

### MEMORANDUM OPINION

In this appeal, M.D.D. (Father) and M.R.M. (Mother) both challenge the trial court's termination of their parental rights to their minor children, L.R.D. (Laurel) and K.A.M. (Kade). In five issues, Father argues that the evidence was legally and factually insufficient to support the trial court's findings that termination of his parental rights was appropriate pursuant to Family Code

subsections 161.001(b)(1)(D), (E), (N), and (O) and that termination of his parental rights was in the children's best interest. In nine issues, Mother argues that the evidence was legally and factually insufficient to support the trial court's findings that termination of her parental rights was appropriate pursuant to Family Code subsections 161.001(b)(1)(B), (C), (D), (E), (L), (N), and (O), that termination was in the children's best interest, and that DFPS, a "nonparent," should be appointed as conservator.

We conclude that the evidence was legally and factually sufficient to support the trial court's findings that both Mother and Father "knowingly placed or knowingly allowed the child[ren] to remain in conditions or surroundings which endanger the physical or emotional well-being" of the children pursuant to Family Code subsection 161.001(b)(1)(D) and that Father engaged in a course of conduct that endangered the children pursuant to Family Code subsection 161.001(b)(1)(E). We likewise conclude that the evidence was legally and factually sufficient to support the trial court's finding that termination of both parents' parental rights was in the children's best interest. Finally, because we uphold the trial court's order terminating Mother's parental rights, we conclude that her challenge to the trial court's conservatorship determination likewise fails. We therefore affirm.

## Background

Laurel, born in the fall of 2012, and Kade, born in the spring of 2014, are the biological children of Mother and Father. In a 2015 order, the trial court established Father's paternity to both children. It found that appointing the parents joint managing conservators was not in the children's best interest, so it appointed Mother managing conservator and Father possessory conservator with visitation rights and child support obligations.

The children primarily lived with Mother until 2017, when they were removed from Mother based on allegations that Mother's then-boyfriend physically abused Laurel. Mother was charged with injury to a child and eventually placed on community supervision for that offense. The children began living with Father and his then-girlfriend, M.H. When Father and M.H. ended their relationship, Father's mother, C.A., assisted him with the children.

In 2019, the trial court modified the 2015 custody order by a "Default Order on Notice of Changed Status." Mother did not appear at that hearing. The 2019 order designated Father as the children's managing conservator, while Mother became the possessory conservator with a standard possession schedule and obligation to pay child support to Father.

Laurel and Kade came into DFPS care in December 2021, after DFPS received a report that Father had physically abused both children. Father was

arrested and charged with the offense of injury to a child for striking Kade with his hand and with assault against a family member by impeding breathing and aggravated assault on a family member for threatening Laurel with a firearm and choking her. Upon Father's arrest, the children were taken to Texas Children's Hospital until temporary care could be arranged for them. DFPS placed the children with M.H. in a "fictive kin" placement on December 31, 2021. The criminal charges against Father were dismissed by the district attorney on April 21, 2023, a few months before the June 2023 trial in this case.

At trial, DFPS sought to terminate both Mother's and Father's parental rights on numerous grounds, including endangerment, constructive abandonment, and failure to complete their family plans of service.

DFPS caseworker J. Bryant testified that Laurel was eleven at the time of trial, and Kade was nine. At the time of trial, they remained in M.H.'s care, where they had been "[s]ince the case opened back in 2021." The placement was meeting all of the children's needs. Bryant testified that Laurel had completed the last school year and passed to the next grade. Laurel was "a little behind in math and reading, but she was getting tutoring. So, she's caught up a lot since being in [M.H.'s] care." Laurel was going to therapy weekly, and still had some behavioral issues, including "tantrums." Bryant testified that M.H. dealt with the behavior

4

issues appropriately, and "she also brings it to the therapist's attention as well so that it can be taken care of through therapy."

Kade's needs were also being met. Bryant testified that he was a little delayed in "reading and math, but he's also getting caught up on a lot since coming into care." He experiences "mild behavior issues, but really nothing that the caregiver can't handle." Both Kade and Laurel were "very bonded" with M.H.

According to Bryant, M.H. had expressed a concern about continuing to care for the children if it meant dealing with their parents and grandparents. Bryant believed that, if both parents were to relinquish their rights, the caregiver was "willing to adopt." Based on the concern regarding permanency of the placement with M.H., the trial court continued the trial setting for several days to allow DFPS and the parents, primarily Father, to discuss and investigate other placements for the children in the event the trial court did not terminate both parents' parental rights. Father had put forward his sister, G.F., as a potential placement.

When trial reconvened, Mother failed to appear, and Father arrived late. DFPS began its case by presenting the testimony of Deputy L. Hernandez, the first officer to respond to the scene following a call from the hotel where Father had been staying with Laurel and Kade in late 2021. Deputy Hernandez found Laurel, who had locked herself in the lobby restroom. Laurel made an outcry of abuse to Deputy Hernandez, telling her that Father "had grabbed her by the throat with both

5

of his hands, impeding her breathing" and that "he had pointed a weapon at her." Laurel told Deputy Hernandez that "she feared for her life [and] thought that her dad was going to kill her." Laurel indicated that the weapon Father threatened her with was a gun. Laurel also told Deputy Hernandez that Father had hit her on her thigh, and Deputy Hernandez observed bruising on Laurel's thigh. Hernandez testified that Father was not present while she talked with Laurel in the lobby. Laurel told Deputy Hernandez that "he might have been in his room." Kade was not present in the lobby either. At that point, Deputy Hernandez sought additional care for Laurel and attempted to find Father and Kade.

Deputy Hernandez testified that Father was eventually detained, and, while detaining him, the deputies located "a weapon, a gun, on his waistband, which was removed." Deputy Hernandez further testified that Father was "belligerent and upset." When Deputy Hernandez explained the outcry that Laurel made, he denied that it occurred. Deputy Hernandez stated, however, that she was able to speak with Kade, and he reported that Father "was upset and grabbed [Laurel]." Kade also told Deputy Hernandez that Father had a gun. Deputy Hernandez asked Kade whether Father had hurt him, and Kade "displayed motions with his fist that his dad will get mad and punch him." Deputy Hernandez testified that she then asked Kade to show her his chest, and he agreed, allowing her to take photographs of visible, older-looking bruises on his chest area. Deputy Hernandez testified that in

addition to the visible bruising on his ribs, Kade also had a bruise on the back of his shoulder. According to Deputy Hernandez, Kade seemed fearful of Father. Deputy Hernandez also reviewed video footage from the hotel that showed Father "chasing the nine-year-old child down the hallway up the stairs . . . where the video showed him lifting her and grabbing her."

DFPS investigator D. Hickman testified that she interviewed Laurel at the hospital, while Laurel and Kade were waiting in the emergency room before they could be placed somewhere safe. Laurel told Hickman that she, Kade, and Father had been living in the hotel. Laurel stated that she got the bruises on her thigh when Father hit her with a belt. Laurel also explained that Kade had bruises on his neck because Father "had his hand around [Kade's] neck." Laurel told Hickman that Father made a threat to giver her "a whopping," which scared her and led to her hiding in the bathroom. Kade also told Hickman that Father punched him in the ribs and "also put his hand on his neck and that's how he had the scratches."

Hickman testified that she attempted to find a family member who could take the children. She "tried the mother, tried to get in touch with the mother but with the CPS history she does have previous CPS history so that was out of the question." The children's grandmother was sick. The children were ultimately placed with M.H., a fictive kin placement.

Caseworker D. Jones testified that he was the first caseworker assigned to the case. When he became involved with the case, Mother was on probation for child endangerment stemming from the prior DFPS case, so Father had custody of the children. Jones stated that Mother complied with the terms of her probation and engaged in some of the requirements of her family plan of service. He testified, however, that Mother did not provide any financial support to the children. Mother did not provide any food, clothing, or similar items to Laurel or Kade. Mother did not have any visitation with the children. Jones testified that this was at least in part due to the court order associated with her child-endangerment charge. Mother explained that charge to Jones by telling him her "previous partner . . . was identified as abusing the oldest kid. So, she had to face stipulations for it not being protective of the children while she was with him."

Father did not work any services while Jones was the caseworker, telling Jones that "he was opposed to working services" and the case was "not his fault." As far as Jones was aware, Father was unemployed and living in the hotel where police responded to the call regarding Laurel locking herself in the lobby bathroom. Father did not provide any financial support, food, clothing, or other items to the children while Jones was assigned to the case. Father had no visitation with the children, both because it was a condition of his bond and because the court ordered that he could not have visitation if he was not doing his services.

Jones testified that he observed some of Laurel's behavioral issues while she lived with M.H. He testified that she would "tell things that didn't happen or things that weren't true when it came to behavior incidents that were taking place at school." Jones also testified that he was called to Laurel's school multiple times to address her behavior issues, including concerns such as "[p]eeking over the bathroom stall, utilizing profane language, making threats to certain students, [and] things of that nature." He noticed improvement in her behavior as she continued to live with M.H.

While the case was pending, Kade expressed to Jones a desire to see his Father, but he never asked to see his Mother. The children have siblings—Mother's other children—and he believed it would be in Laurel and Kade's best interest to have some kind of relationship with the siblings. Jones also testified that the children's grandmother, C.A., attempted to stay in contact. M.H. eventually refused to supervise visits between Laurel, Kade and C.A. because C.A. undermined her with the children and was disrespectful. Jones began supervising the visits, and he also testified that C.A. would undermine instructions or directions that he gave to the children. C.A. lived in a hotel, so she was not considered as a placement for the children.

Bryant, the caseworker at the time of trial, provided additional testimony once trial recommenced. She testified regarding Mother's history with DFPS,

stating the children were originally removed from her care in 2017 "due to allegations against [Mother's] mother and boyfriend of physical abuse to [Laurel]." Mother was charged with child endangerment and was on probation for that charge when the children were removed from Father and the current DFPS case began. Bryant testified that DFPS provided Mother with a family plan of service, but Mother had not completed any of its requirements. She started some of the services, such as obtaining a psychological evaluation and attending some therapy sessions, but she was unsuccessfully discharged because she quit going to the appointments. Mother quit appearing for required drug tests around the same time that her child-endangerment probation ended. Mother was employed full-time at a fast-food restaurant and had an apartment, but Bryant had never been able to see it. Mother was never home any of the times Bryant made a "pop-up" visit, and Mother never kept any of the prearranged appointments with Bryant.

Bryant testified that DFPS was concerned about Mother's "past assaultive behavior from her prior case and prior conviction" as it related to her ability to be a stable parent for Laurel and Kade. Bryant was also concerned about Mother's failure to complete any services, testifying that Mother had not taken any steps to alleviate DFPS's concerns regarding her ability to be a stable parent.

Bryant also testified that Father refused to engage in any of the services provided to him. He initially told her that "[h]e didn't want to work with [DFPS]

until he got his criminal case taken care of," but he did not work any of the services set out in his family plan of service after his criminal charges were dismissed. Bryant testified that, in addition to his arrest that brought the children into DFPS custody, he was arrested again in December 2022 for "abuse of his girlfriend." Those charges were also dismissed. Father has not had any contact with the children during the pendency of the case because there was a "no-contact order" in place. He did not send any support, gifts, birthday cards, or similar items through DFPS. Father did not appear for any of the requested drug tests, and he did not provide any proof that he obtained stable employment or housing.

Bryant testified that DFPS believed it was in the children's best interest that it be named their managing conservator, and she believed it was in the children's best interest that both parents' parental rights be terminated and the children remain in their current placement with M.H., who wanted to adopt them.

Arcadio Rodriguez, the children's therapist, testified that he provided cognitive behavioral therapy and trauma-focused therapy services to the children. When he first started seeing Laurel, immediately after she came into DFPS care, she demonstrated "regressive behaviors": "I'm referring to enuresis. She [had] nocturnal enuresis, diurnal enuresis, nightmares, aggressive behaviors, temper tantrums, head banging, door slamming. So, she was virtually out of control." Rodriguez began by focusing on behavioral therapy "to try to get a handle on her

11

acting out behaviors," then he progressed to "trauma focus" therapy. He testified that Laurel had "progressed very well" and improved in "all areas of her developmental process."

Kade also demonstrated some regressive behaviors: "He was very insecure, afraid, abandonment issues, hyperactivity and unable to stay on task." Kade also showed improvement and "has begun to flourish tremendously."

Rodriguez testified that both children reported to him that Father would "whip" them, either when he was mad or when they complained about being hungry. They also told him that, when they lived with Father, they lived out of hotels.

Rodriguez testified that the children were "very strongly" bonded to M.H. He further stated that the children have "reached [a] tremendous level of stability now in their life. They've expressed feeling very safe, secure in their current environment and that they wish to stay there permanently." DFPS asked Rodriguez about whether either child had expressed any desire to live with Father, and Rodriguez answered, "In the last session, [Kade], he said, 'no.'" Laurel also said no. Rodriguez also testified that he believed continued contact with Father would "most definitely" cause the children more trauma because "[i]t would re-expose both children to the chaos, instability and trauma that the dad subjected them to," and it would "raise the probability that they would start regressing back to their

original baseline, which would be causing more harm than what they would benefit from seeing the dad." Rodriguez testified that he believed it would be "catastrophic" to return the children to Father, stating that it would cause them to "regress behaviorally, emotionally, socially, and academically in all areas of their developmental process" and that they "would go into reverse instead of them building on the positive gains that they've made and going forward." He believed that termination of both parents' rights "would help them tremendously in the healing process because that would give them the opportunity to complete their healing and move forward in their developmental process." Rodriguez testified that the trauma the children experienced, and "their behavioral, regressed issues" were "a direct result of the parents" actions, which he later specified as being "poor parenting and chaotic life[styles]."

Rodriguez also testified that, for some time the children were having phone conversations with C.A., their paternal grandmother, but he eventually had to cut those off because they upset the children and led to them exhibiting more regressive behaviors. Rodriguez believed that the children would continue to need ongoing trauma therapy, at least until they were 18 years old.

M.H. testified that she had been caring for the children for a year-and-a-half. She testified that she had known the children for longer than that because she was dating Father "when the children were removed from the mom's home." She and

Father broke up, and she did not see the children very regularly for a while. She eventually ran into them again, and she learned that Father "was living with them in hotels and he was having a hard time. He was having a hard time just having children but also with [Laurel's] behavior." M.H. testified that she helped out to the extent she could, while "[t]hey would move to different [hotels]. I think based on, you know, his money that was available, what he had. But I know they moved" because "they would be in different places when I would go either to pick them up or bring them things."

M.H. testified that she was very bonded to the children and that they were "doing well" and "progressing" since they had been in her care. She testified that Laurel had been diagnosed with oppositional defiant disorder and had a behavioral individual education plan at her school. She was improving and doing fine academically. Kade was also doing well. Both children had "some social development delays," which M.H. believed was "normal for children with trauma." She engaged in "normal" activities with them, like having dinner together and watching movies on the weekend. Both children played sports regularly through their local YMCA.

M.H. testified regarding Laurel's behavior when she was first placed in her home: Laurel "was angry most of the time. She was abusive towards [Kade], physically and verbally. She would steal and lie about everything, even just things

14

you wouldn't think of." Regarding Laurel's tendency to lie, M.H. elaborated that Laurel would lie about "[e]verything from, you know, whether she brushed her teeth or put her deodorant on to stealing from the teachers." M.H. recounted, "She said one of her daycare teachers spit on her and was racist and we watched the video and that never happened, things like that because she wanted her to get fired." M.H. testified that Laurel's behavior, when she first arrived in M.H.'s home, was similar to what it had been after Laurel was removed from Mother's home at the age of four, when she would also experience night terrors and other sleeping problems. M.H. stated that Laurel's behavior had improved significantly over the last year and a half that she had lived with M.H., including that Laurel's relationship with Kade improved significantly.

M.H. testified that she never received anything from either Mother or Father for the children—no support either in the form of money or other items. M.H. believed that she was not supposed to have contact with the parents directly, but she also testified that she never received anything they might have sent through DFPS either. They had not sent any gifts or cards for birthdays or other holidays.

M.H. testified that she never saw Father abuse the children while they were dating. She also testified that Father "has no parenting skills, that parenting classes would be good for him, therapy. He has things he needs to work through to be a stable dad and he knows that."

15

The DFPS supervisor for the case, L. Crawford, testified that the children were removed from Mother's care because of "the 2018 case," which involved a "physical abuse allegation." DFPS disposed of that allegation as "reason to believe." Mother was given a family plan of service, which she completed in part, such as providing a lease and informing DFPS that she was employed. Crawford stated that Mother started several of her services but did not complete them. The previous abuse allegation also resulted in Mother's having a criminal history—she was on probation for a charge of injury to a child when the instant case started. When the children were removed from Father following his arrest, the children could not be placed with Mother because "[t]here was a no-contact order at the time [as a condition of her probation]; and mother was not able to be located at the beginning of the case." When asked what concerns DFPS had about Mother, Crawford replied: "The past CPS history, lack of contact with the children for going on years and that would be lack of relationship with the children."

Regarding Father, Crawford testified that he was arrested for the conduct that brought the children into DFPS care. Those charges were eventually dismissed. Crawford testified that Father had been arrested again in 2022 for assault, noting that it was listed as "domestic violence" in his criminal history. That charge was also dismissed. Father had not worked any of the services provided in his family plan of service. He did not appear for any of the requested drug tests.

16

Crawford testified that, to his knowledge, Father was not employed and did not have stable housing. Father had not attended any therapy or parenting classes. Father was "adamant" that he did not commit the offense that the children accused him of and did not believe he should be required to complete services.

Crawford testified that he did not believe either parent had demonstrated an ability to provide a safe and stable environment for the children. He acknowledged that DFPS had no opportunity to observe either parent interact with the children, in part due to the no-contact order for Mother's probation and because of the criminal charges that had been pending against Father. Once Father's criminal charges were dismissed, DFPS still did not arrange visitation between Father and the children because of their therapist's opinion that contact would be detrimental to the children. DFPS's goal was termination of both parents' rights and fictive-kin adoption. In the alternative, DFPS was considering another family member who was interested in taking custody of the children if DFPS was named permanent managing conservator.

Althea Lacewell, the CASA volunteer, testified that she had observed both children since the beginning of the case. They had shown a lot of improvement and their placement with M.H. was serving them well. She also believed that their trauma therapy was benefitting them "tremendously." Lacewell attempted to meet with Mother multiple times, beginning in the fall of 2022, once Mother had

completed her probation. At that time, Mother quit attempting to work any of her services and quit showing up for drug tests and counseling appointments. Lacewell would make arrangements with Mother to meet, but Mother would not show, telling Lacewell that she forgot the appointment. Lacewell had not been able to meet with Father at all and had been able to speak with him only at the last court hearing. Lacewell testified that CASA's recommendation was to terminate parental rights so that the children could be adopted. Lacewell did not believe either parent could provide a safe and stable environment for the children, citing Father's statement to her that he did not have a home and Laurel's statements that Father "beat" her. She also testified that the children told her they loved Father, but did not really know Mother.

Mother did not appear at trial. No witness testified on her behalf. Father testified that, at the time of trial, he was staying with friends and had been "on and off" for "about a year." Father further testified that he did not have a job at the time of trial. Father likewise did not have his own form of transportation, which he testified was why he was late both days of trial. He testified regarding his arrest for assault against his current girlfriend, testifying that the charges were dismissed because she did not want to pursue charges and signed an affidavit of non-prosecution. Father further acknowledged a prior arrest for terroristic threat against his sister, who DFPS was investigating as an alternative placement for the children

in the event that parental rights were not terminated. Father denied the allegations of abuse against the children, testifying that he "never abused [his] kids." He acknowledged spanking the children with his hand. He further testified that, while the children were living with him, he never exposed them to anyone who harmed them or to anyone who did drugs.

Father also testified that he did not complete any of the services on his family plan of service because he felt that, by doing so, he was "basically volunteering to agree with something that [he] didn't do," emphasizing that he was arrested based only on "allegations" that were not true. He denied using drugs, and he testified that he refused to appear for drug tests because he did not "trust the whole process of this." He testified that, at the time of trial, he was not able to provide a stable housing for himself and his children, but he was "working towards that now that [he didn't] have any criminal cases over [his] head."

Father testified that, after he obtained primary custody of the children in 2017, and even after the 2019 order, Mother never paid regular child support. She did not exercise her visitation with the children pursuant to the 2019 order, nor did she have any regular contact with them. He testified that he did not think Mother had seen the children at all since September 2017 when he first obtained custody of them.

19

Father testified that he observed several problems with Laurel's behavior when he first got custody of the children. He was not aware at the time of any diagnosis, but he observed things like lying, "physical abuse to her brother and other kids at school," "a resentment for women," and a refusal to "talk at school." He further testified that when Laurel first came to live with him—while he was still in a relationship with M.H. and they were living together—they attempted to get help from DFPS for Laurel but the counseling Laurel received did not appear to help very much. After he and M.H. quit dating, Father attempted to get Laurel some help through the school, but they "ended up moving to Florida a little bit after that." At some point after they returned to the Houston area, Father was living on unemployment and then on pandemic-relief funds. He testified that Laurel was still having issues, which he addressed by having his mother come get Laurel sometimes. He did not think parenting classes would help him because it "was just the financial part that was getting to me and just the behavior, [Laurel]. [Kade] was not a problem or anything. It was just mainly [Laurel]."

Father testified that he wanted to keep his parental rights, and he was hoping that the children could be placed with his sister.

Paternal grandmother C.A. testified that the children spent a lot of time with her beginning when the children were first released into Father's care, and "they were with [her] a while until [she] ended up in the hospital with COVID." When

the children were removed from Father, C.A. initially thought they were going to stay with M.H. just until C.A. was recovered from COVID. C.A. wanted custody of the children at one point, but at the time of trial, she believed it would be in their best interest to live with her daughter or her sister but still have visitation with Father. She thought it would be in the children's best interest to stay with family members.

The trial court admitted into evidence copies of the 2015 and 2019 court orders regarding custody between Mother and Father. DFPS also offered, and the trial court admitted, Hickman's removal affidavit, which contained a brief account of Mother's previous history with DFPS. It recounted that the allegations of abuse against Laurel while she was in Mother's care were "ruled as reason to believe," and Mother "was arrested for injury to the child." Hickman's affidavit also contained criminal backgrounds for both parents, which was partially redacted. It showed that Mother's only arrest was for the injury to a child charge in 2017.

Hickman's affidavit also contained additional information that she received from the children regarding the events that led to DFPS removing them from Father's care. Laurel told Hickman that her family had been living in various hotels for eight months. Both children told Hickman that they were sometimes hungry and did not get enough to eat. Both children also told Hickman about various instances in which Father would "whoop," punch, or strike them with his

21

hand or a belt. Laurel recounted that Father "put his hands around her neck" and "pointed his gun at her." Laurel told Hickman that, when Father "pulled the gun out on her, his bullets fell out."

Hickman's affidavit summarized the forensic interview conducted with both children, which again resulted in Kade telling the interviewer that he had not seen his mother in five years. He told the interviewer that he did not get enough to eat and that Father "starves them." Kade told the interviewer that Father "smokes weed, cigarettes, and cigars" and owns a gun that he keeps under the bed. Kade further told the interviewer that Father "pulls [Kade's] head up like a suitcase" and "beat [Laurel] on the cheek," putting her "on the floor." He said that "happens a lot," and related a few other instances in which Father struck or grabbed one of the children. Kade also recounted the incident when Father "took the pistol and tried to shoot [Laurel] and the bullets fell down and the pistol did not shoot." Laurel likewise completed a forensic interview that Hickman recounted in her affidavit. Laurel again repeated that Father had choked her with his hands and pointed his gun at her, in addition to striking her on other occasions, including with a belt. Laurel recounted another incident in which Father "held a knife and pointed at her face."

The trial court terminated Mother's rights under subsections 161.001(b)(1) (B), (C), (D), (E), (L), (N), (O), and it terminated Father's rights under subsections

22

161.001(b)(1)(D), (E), (N), and (O). The trial court further found that termination of both parents' parental rights was in the children's best interest. It named DFPS as the children's sole managing conservator.

Father and Mother both appealed.

## Standard of Review

To terminate parental rights pursuant to Family Code section 161.001, DFPS has the burden to prove by clear and convincing evidence: (1) one of the predicate grounds in subsection 161.001(b)(1) and (2) that termination is in the best interest of the child. TEX. FAM. CODE § 161.001(b). Clear and convincing evidence requires "proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007. The standard for reviewing legal and factual sufficiency of the evidence to support these findings reflect the elevated burden of proof. *See In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018).

"In conducting a legal-sufficiency review, the reviewing court cannot ignore undisputed evidence contrary to the finding, but must otherwise assume the factfinder resolved disputed facts in favor of the finding." *Id.* at 630–31. "Evidence is legally sufficient if, viewing all the evidence in the light most favorable to the fact-finding and considering undisputed contrary evidence, a reasonable factfinder could form a firm belief or conviction that the finding was true." *Id.* at 631.

Reviewing the factual sufficiency of evidence "requires weighing disputed evidence contrary to the finding against all the evidence favoring the finding," and so we "must consider whether disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding." *Id.* "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id.* We give due deference to the fact finder's findings, and we cannot substitute our own judgment for that of the fact finder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006); *see also In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009) (holding that factfinder is sole judge of witnesses' credibility and demeanor).

"To affirm a termination judgment on appeal, a court need uphold only one termination ground—in addition to upholding a challenged best interest finding—even if the trial court based the termination on more than one ground." *In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019) (citing TEX. FAM. CODE § 161.001(b)). Nevertheless, "due process and due course of law requirements mandate that an appellate court detail its analysis for an appeal of termination of parental rights under section 161.001(b)(1)(D) or (E) of the Family Code" when the trial court's order of termination contains findings on those grounds. *Id.* at 237.

### Endangerment Findings

Mother and Father both challenge the legal and factual sufficiency of the evidence supporting the trial court's endangerment findings under subsections 161.001(b)(1)(D) and (E).

**A.    Law on Endangerment**

Subsection 161.001(b)(1)(D) allows a trial court to terminate a parent's rights if the court finds by clear and convincing evidence that the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." TEX. FAMILY CODE § 161.001(b)(1)(D). Subsection (E) allows a trial court to terminate a parent's rights if the court finds by clear and convincing evidence that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." *Id.* § 161.001(b)(1)(E).

Endangerment means to expose to loss or injury; to jeopardize. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (per curiam) (holding that "endanger" means to expose child to loss or injury or to jeopardize child's emotional or physical health); *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). A finding of endangerment requires more than the threat of metaphysical injury or

25

possible ill effects from a less-than-ideal family environment, but DFPS does not have to prove that the conduct was directed at the child or that the child suffered an actual injury. *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012).

While both subsections (D) and (E) focus on endangerment, they differ regarding the source and proof of endangerment. *In re J.I.G.*, No. 01-18-00023-CV, 2018 WL 3233874, at *8 (Tex. App.—Houston [1st Dist.] July 3, 2018, no pet.) (mem. op.) (citing *In re A.S.*, 261 S.W.3d 76, 83 (Tex. App.—Houston [14th Dist.] 2008, pet. denied)). Subsection (D) "focuses on the child's environment and may be utilized as a ground for termination when the parent has 'knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child.'" *In re J.W.*, 645 S.W.3d 726, 749 (Tex. 2022) (quoting TEX. FAM. CODE § 161.001(b)(1)(D)); *see also In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.) (holding, in context of subsection (D)'s focus on child's living environment, that parental conduct is relevant to child's environment). The child's "environment" encompasses the suitability of the child's living conditions and the conduct of parents or others in the home. *In re S.R.*, 452 S.W.3d at 360. Inappropriate, abusive, or unlawful conduct by a parent or other persons who live in the children's home can create an environment that endangers the physical and emotional well-being of children as required for termination under subsection (D).

*In re E.J.*, No. 14-23-00387-CV, 2023 WL 8043686, at *9 (Tex. App.—Houston [14th Dist.] Nov. 21, 2023, no pet.) (mem. op.) (citing *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.)). "As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child." *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied). A single act or omission may support termination under subsection (D). *In re E.J.*, 2023 WL 8043686, at *9 (citing *Jordan v. Dossey*, 325 S.W.3d 700, 721 (Tex. App.—Houston [1st Dist.] 2010, pet. denied)).

Subsection (E) requires evidence that the endangerment was the result of the parent's conduct, including acts, omissions, or failures to act. *In re S.R.*, 452 S.W.3d at 360; *In re J.I.G.*, 2018 WL 3233874, at *8; *In re J.T.G.*, 121 S.W.3d at 125. Termination under subsection (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *In re S.R.*, 452 S.W.3d at 360. "While endangerment often involves physical endangerment, the statute does not require that conduct be directed at a child or that the child actually suffers injury; rather, the specific danger to the child's well-being may be inferred from parents' misconduct alone." *Id.* at 360 (citing *Texas Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)).

A court may consider actions and inactions occurring both before and after a child's birth to establish a "course of conduct." *In re V.A.*, 598 S.W.3d 317, 331 (Tex. App.—Houston [14th Dist.] 2020, pet. denied). A parent's past endangering conduct may create an inference that the past conduct may recur and further jeopardize the child's present or future physical or emotional well-being. *See In re S.R.*, 452 S.W.3d at 366–67; *In re M.T.R.*, 579 S.W.3d 548, 568–69 (Tex. App.—Houston [14th Dist.] 2019, pet. denied).

## B. Analysis as to Father

Father argues that the evidence was legally and factually insufficient to support the trial court's findings that he endangered his children. Specifically, he argues that the record "shows a complete absence of any evidence necessary to support" the trial court's finding under subsection (D) or (E). We disagree. Considering all the evidence in the light most favorable to the trial court's finding and considering undisputed contrary evidence, the trial court could have formed a firm belief or conviction that Father "knowingly placed or knowingly allowed the child[ren] to remain in conditions or surroundings which endanger[ed] the physical or emotional well-being of the child[ren]" and that he "engaged in conduct or knowingly placed the child[ren] with persons who engaged in conduct which endangers the physical or emotional well-being of the child[ren]." *See* Tex. Fam.

CODE § 161.001(b)(1)(D), (E); *see also In re A.C.*, 560 S.W.3d at 631 (setting out standard for legal-sufficiency review).

The trial court heard evidence that Father repeatedly abused both Laurel and Kade. "Domestic violence may be considered evidence of endangerment." *In re C.J.O.*, 325 S.W.3d 261, 265 (Tex. App.—Eastland 2010, pet. denied); *In re R.S.-T.*, 522 S.W.3d 92, 110 (Tex. App.—San Antonio 2017, no pet.) ("Domestic violence, want of self-control, and propensity for violence may be considered as evidence of endangerment.") (quoting *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.)).

Deputy Hernandez testified regarding the events that lead to DFPS removing the children from Father's care, including Laurel's outcry of abuse. Laurel told Hernandez that Father "had grabbed her by the throat with both of his hands, impeding her breathing" and that "he had pointed a weapon at her." Laurel told Deputy Hernandez that "she feared for her life [and] thought that her dad was going to kill her." Kade also told Hernandez that Father had struck his children. Kade told Deputy Hernandez that Father "was upset and grabbed [Laurel]" and that Father had a gun. Kade further indicated that Father had punched him. In addition to the children's outcry statements, Deputy Hernandez observed bruising, and she noticed that the children seemed fearful of Father. Deputy Hernandez also related the fact that she observed video footage from the hotel that showed Father

29

"chasing the nine-year-old child down the hallway up the stairs . . . where the video showed him lifting her and grabbing her." *See In re E.J.*, 2023 WL 8043686, at *9 (holding that inappropriate, abusive, or unlawful conduct by parent can create environment that endangers physical and emotional well-being of children as required for termination under subsection (D)); *In re M.R.J.M.*, 280 S.W.3d at 502 (same); *see also Jordan*, 325 S.W.3d at 721 (holding that single act or omission may support termination under subsection (D)).

The subsequent investigation by DFPS provided additional information. Hickman, the DFPS investigator, testified at trial that, when she interviewed the children, Laurel stated that she got the bruises on her thigh when Father hit her with a belt and that Kade had bruises on his neck because Father "had his hand around [Kade's] neck." Laurel told Hickman that Father made a threat to give her "a whopping," which scared her and led to her hiding in the bathroom. Kade also told Hickman that Father punched him in the ribs and "also put his hand on his neck and that's how he had the scratches." Hickman's affidavit, which was also admitted into evidence, stated that the children indicated that Father struck them regularly, and she related that the children provided similar information during their forensic interviews. *See In re E.J.*, 2023 WL 8043686, at *9; *In re G.P.*, 01-16-00346-CV, 2016 WL 6216192, at *11 (Tex. App.—Houston [1st Dist.] Oct. 25, 2016, no pet.) (mem. op.) ("Direct physical abuse is clearly conduct that endangers

30

a child."); *In re L.E.M.*, No. 02-11-00505-CV, 2012 WL 4936607, at \*14 (Tex. App.—Fort Worth Oct. 18, 2012, no pet.) (mem. op.) (holding that children's statements of physical abuse by parents sufficient to support endangerment finding).

In connection with this case, Father was arrested and charged with the offenses of injury to a child for striking Kade with his hand, assault against a family member by impeding breathing for choking Laurel, and aggravated assault on a family member for threatening Laurel with a firearm. The criminal court issued a protective order requiring that he have no contact with his children while the criminal charges were pending. Bryant also testified, and Father acknowledged in his own testimony, that Father was arrested again in December 2022 for "abuse of his girlfriend." Additionally, there was evidence that Father had previously made a terroristic threat against his sister. *In re G.P.*, 2016 WL 6216192, at \*12–13, 16 (considering Father's arrests for making terroristic threat and assault in determining that evidence was sufficient to support endangerment findings pursuant to subsections (D) and (E)).

In addition to the evidence of repeated physical abuse and Father's other violent or criminal behavior, the evidence demonstrated that Father failed to maintain a job or stable housing while the children were living with him. Laurel reported to Hickman that the family had been living in hotels for eight months

31

prior to DFPS removing her and Kade from Father's care. M.H. and Father himself also testified that he moved hotels regularly. Both children told DFPS investigator Hickman that they all shared a bed and sometimes did not have enough food. Father's testimony also indicated that the instability made it difficult for him to address Laurel's behavioral concerns. Father testified that he attempted to get help from DFPS for Laurel but the counseling Laurel received did not appear to help very much. He also attempted to get Laurel some help through the school, but they "ended up moving to Florida a little bit after that."

M.H. and Rodriguez, the children's trauma therapist, both testified about the challenging behaviors Laurel demonstrated when she was first removed from Father care. Rodriguez testified that when Laurel came into DFPS care, she demonstrated "regressive behaviors": "I'm referring to enuresis. She [had] nocturnal enuresis, diurnal enuresis, nightmares, aggressive behaviors, temper tantrums, head banging, door slamming. So, she was virtually out of control." Kade also demonstrated regressive behaviors, with Rodriguez testifying, "He was very insecure, afraid, abandonment issues, hyperactivity and unable to stay on task." Rodriguez testified that both children reported to him that Father would "whip" them, either when he was mad or when they complained about being hungry. Rodriguez believed that the trauma the children experienced, and "their behavioral, regressed issues," were "a direct result of the parents" actions, which

32

he later qualified as "poor parenting and chaotic life[style]." This testimony thus provides some evidence that the environment in which the children were living prior to removal from Father was endangering to their physical and emotional well-being.

Both caseworkers—Jones and Bryant—testified that Father refused to participate in any of the services provided in his family plan of service, nor did he engage in any contact with the children, even after his criminal charges were dismissed. He provided no gifts, cards, or other support to the children. Father did not appear for any of the requested drug tests,[1] and he did not provide any proof that he obtained stable employment or housing. Thus, there was evidence that Father was not willing to address the circumstances that contributed to the endangering environment that the children experienced before they were removed from his care. *See In re C.W.M.P.*, No. 14-20-00571-CV, 2021 WL 244865, *7 (Tex. App.—Houston [14th Dist.] Jan. 26, 2021, pet. denied) (mem. op.) (holding that missed visitations and failure to complete court-ordered service plan may constitute evidence supporting endangerment finding because such conduct

[1]   *See In re W.E.C.*, 110 S.W.3d 231, 239 (Tex. App.—Fort Worth 2003, no pet.) (recognizing that factfinder could reasonably infer that parent's failure to complete scheduled screenings indicated she was avoiding testing because she was using drugs). Father argues that this inference should not apply to him because there was no evidence indicating that drug use was a factor in the children's removal from his care. The record, however, does not support Father's contention. Laurel and Kade both told the DFPS investigator that Father smoked "weed," and Laurel indicated that Father "always smokes something in a glass little thing," and "when he smokes the 'thing' he gets mad and whoops them or kicks them out the door."

subjects children to instability and uncertainty, which endangers children).

Rodriguez testified that he believed continued contact with Father would "most definitely" cause the children more trauma because "[i]t would re-expose both children to the chaos, instability and trauma that the dad subjected them to" and it would "raise the probability that they would start regressing back to their original baseline, which would be causing more harm than what they would benefit from seeing the dad."

This evidence indicates that Father, through the abuse and instability set out above, "knowingly placed or knowingly allowed the child[ren] to remain in conditions or surroundings which endanger[ed] the physical or emotional well-being of the child[ren]." *See* TEX. FAM. CODE § 161.001(b)(1)(D). This same evidence was based on Father's own conduct. Thus, the evidence was sufficient for the trial court to determine that Father engaged in a course of conduct that involved abuse of the children and subjecting them to instability such as living in multiple hotel rooms and not having enough food. *See id.* § 161.001(b)(1)(E) (providing that parental rights are subject to termination if parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child").

Father argues that the evidence was insufficient because "[t]he only evidence that was cited in the entire case was the occurrence that led to [Father's

arrest] and the removal of the children," citing the testimony of Deputy Hernandez. This view of the evidence omits evidence from other witnesses, like Hickman and Rodriguez, who also testified regarding outcries of abuse by the children, and other evidence, such as visible bruising and the regressive behaviors associated with trauma and instability demonstrated by both children. The fact that the criminal charges against Father were dismissed does not preclude the trial court from finding the evidence of abuse, including the testimony from Deputy Hernandez, Hickman, and Rodriguez, credible and sufficient to support a finding of endangerment. *See In re J.O.A.*, 283 S.W.3d at 345 (holding that father's history of domestic violence, admitted marijuana use, and previous incarceration on criminal charges that were later dismissed constituted sufficient evidence of endangerment); *see also In re T.G.R.-M.*, 404 S.W.3d 7, 14–15 (Tex. App.–Houston [1st Dist.] 2013, no pet.) ("Although charges stemming from the[] two arrests were ultimately dismissed, each time the mother was jailed, she was absent from [child]'s life and was not able to provide for [child]'s physical and emotional needs.").

Thus, despite the dismissal of the criminal charges, the trial court could nevertheless have concluded that the testimony regarding abuse and the consequences of Father's arrest constituted clear and convincing evidence that Father placed the children in conditions that endangered their physical and emotional wellbeing, and that he engaged in a course of conduct that endangered

35

them. *See In re A.K.T.*, No. 01-18-00647-CV, 2018 WL 6423381, at \*12 (Tex. App.—Houston [1st Dist.] Dec. 6, 2018, pet. denied) (mem. op.) (recognizing that courts consider evidence of physical abuse in termination cases without requiring evidence that conduct resulted in criminal conviction).

Father also points to the testimony of M.H. and Jones that Laurel had been known to lie, and he points to M.H.'s testimony that she had never seen Father harm his children and that it was hard for her to believe the allegations made against Father. M.H. also testified, however, that she knew Father "was having a hard time just having children but also with [Laurel's] behavior" prior to the children's removal, and she also testified that Father "has no parenting skills, that parenting classes would be good for him, therapy. He has things he needs to work through to be a stable dad and he knows that."

This disputed evidence implicates the weight and credibility of the testimony addressing Laurel's outcry of abuse and Father's own credibility in denying the allegations of abuse. We defer to the trial court as the fact-finder to resolve these issues. *See In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014) (factfinder had "full opportunity to observe witness testimony first-hand" and was "sole arbiter when assessing the credibility and demeanor of witnesses"); *In re H.R.M.*, 209 S.W.3d at 108 (holding that reviewing court must give due deference to fact finder's findings and cannot substitute its own judgment for that of fact finder); *see also In re A.C.*,

36

560 S.W.3d at 361 (holding that in factual sufficiency review, appellate courts weigh "disputed evidence contrary to the finding against all the evidence favoring the finding," and "must consider whether disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding").

Considering the entire record, including the fact that both children made outcries of abuse and the observations made by Deputy Hernandez and others regarding bruising and demeanor of the children, we conclude that the disputed evidence that the trial court could not have credited in favor of the finding is not so significant that the trial court could not have formed a firm belief or conviction that its findings pursuant to subsections (D) and (E) were true. *See In re A.C.*, 560 S.W.3d at 361.

Because we have affirmed the trial court's findings under subsections (D) and (E), we need not address the trial court's findings pursuant to (N) and (O). *See In re N.G.*, 577 S.W.3d at 232, 237 (holding that appellate court need uphold only one termination ground to affirm termination judgment on appeal, and "due process and due course of law requirements mandate that an appellate court detail its analysis for an appeal of termination of parental rights under section 161.001(b)(1)(D) or (E) of the Family Code" when the trial court's order of termination contains findings on those grounds).

We overrule Father's first through fourth issues.

## C.    Analysis as to Mother

DFPS presented evidence that Mother "knowingly placed or knowingly allowed the child[re] to remain in conditions or surroundings which endanger[ed] the physical or emotional well-being of the child[ren]." *See* TEX. FAM. CODE § 161.001(b)(1)(D).

DFPS presented evidence that the children lived with Mother until 2017, when they were removed from Mother based on allegations that Mother's then-boyfriend physically abused Laurel. Both DFPS caseworkers, Jones and Bryant, testified regarding Mother's history with DFPS. Bryant testified that the children were originally removed from her care in 2017 "due to allegations against [Mother's] mother and boyfriend of physical abuse to [Laurel]." Jones stated that Mother explained that the charge arose based on abuse by her "previous partner: against Laurel, and Mother herself faced charges for "not being protective of the children while she was with him." DFPS's own internal investigation determined that there was "reason to believe" the allegations against Mother. Mother was charged with injury to a child and was placed on community supervision for that offense. *See In re R.S.-T.*, 522 S.W.3d at 110 (holding that domestic violence may be considered as evidence of endangerment); *In re E.J.*, 2023 WL 8043686, at *9 (holding that inappropriate, abusive, or unlawful conduct by parent can create

38

environment that endangers physical and emotional well-being of children as required for termination under subsection (D)).

The children began living with Father. Mother had almost no contact with the children after they were removed in 2017. *See In re L.M.*, 572 S.W.3d 823, 835–36 (Tex. App.—Houston [14th Dist.] 2019, no pet.) (upholding finding of endangerment based in part on parent's "wholesale absence" from child's life). The record included the 2019 default modification order, providing that Mother failed to appear at the modification hearing and ordering that Father be named the children's managing conservator. The 2019 order required Mother to pay Father support. Father, however, testified that, after he obtained primary custody of the children in 2017, and even after the 2019 order, Mother never paid regular child support. She did not exercise her visitation with the children pursuant to the 2019 order, nor did she have any regular contact with them. He testified that he did not think Mother had seen the children at all since September 2017 when he first obtained custody of them. *See In re C.W.M.P.*, 2021 WL 244865, *7 (holding that missed visitations and failure to complete court-ordered service plan may constitute evidence supporting endangerment finding because such conduct subjects children to instability and uncertainty, which endangers children).

In addition to Father's testimony that Mother did not see the children after 2017 and did not provide support as ordered, Hickman testified that she attempted

to find a family member who could take the children after they were removed from Father. Hickman "tried the mother, tried to get in touch with the mother but with the CPS history she does have previous CPS history so that was out of the question."[2] DFPS supervisor Crawford testified that the children could not be placed with Mother after they were removed from Father's care because "[t]here was a no-contact order at the time [as a condition of her probation]; and mother was not able to be located at the beginning of the case." Crawford was concerned about Mother's "past CPS history [and the] lack of contact with the children for going on years and that would be lack of relationship with the children."

Jones and Bryant both testified that DFPS provided Mother with a family plan of service, but Mother did not complete any of its requirements. Mother did not provide any financial support to the children, nor did she provide any food, clothing, or similar items to the children. Bryant testified that Mother started some of the services, such as obtaining a psychological evaluation and attending some therapy sessions, but she was unsuccessfully discharged because she quit going to the appointments. Mother quit appearing for required drug tests around the same time that her child-endangerment probation ended. Mother was employed full-time at a fast-food restaurant and had an apartment, but Bryant had never been able to

---

[2]     Mother complains about the admission of evidence in the affidavit from Hickman. But Hickman also testified at trial, and Mother's attorney requested and received redactions from Hickman's affidavit. There was sufficient evidence outside the affidavit to support the trial court's findings.

see it. Mother was never home any of the times Bryant made a "pop-up" visit, and Mother never kept any of the prearranged appointments with Bryant. Lacewell, the CASA volunteer, likewise attempted to meet with Mother multiple times, beginning in the fall of 2022, once Mother had completed her probation, but was unable to do so.

Bryant testified that DFPS was concerned about Mother's "past assaultive behavior from her prior case and prior conviction" as it related to her ability to be a stable parent for Laurel and Kade. Bryant was also concerned about Mother's failure to complete any services, testifying that Mother had not taken any steps to alleviate DFPS's concerns regarding her ability to be a stable parent. Crawford likewise testified that he did not believe either parent had demonstrated an ability to provide a safe and stable environment for the children. He acknowledged that DFPS had not had an opportunity to observe Mother interact with the children, in part due to the no-contact order for Mother's probation. However, Mother's probation concluded while the case was pending. DFPS was not aware of any attempts by Mother to visit or contact the children, and Lacewell testified that the children did not really know Mother. DFPS did not attempt to arrange any visitation because of the therapist's opinion that contact would be detrimental to the children.

Thus, the evidence demonstrates that Mother "knowingly placed or knowingly allowed the child[re] to remain in conditions or surroundings which endanger[ed] the physical or emotional well-being of the child[ren]" when she failed to protect Laurel from her partner's abuse. *See* TEX. FAM. CODE § 161.001(b)(1)(D). The 2017 incident itself, reflected in Mother's prior history with DFPS and which resulted in criminal charges against Mother, demonstrated that the children were in an unsafe environment with Mother. *See In re E.J.*, 2023 WL 8043686, at *9 (holding that single act or omission may support termination under subsection (D)); *In re G.P.*, 2016 WL 6216192, at *12 ("Notably, a parent's abuse of another child is conduct that supports a finding of endangerment.").

Furthermore, the consequences of that criminal charge—Mother was placed on probation and was subject to a no-contact order—resulted in her absence from the children's lives. This left them in the care of Father who, as set out above, also subjected the children to abuse and instability. *Cf. In re V.V.*, 349 S.W.3d 548, 554 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) ("Intentional criminal activity that exposes a parent to incarceration is conduct that endangers the physical and emotional well-being of a child."); *In re S.M.L.*, 171 S.W.3d 472, 479 (Tex. App.– Houston [14th Dist.] 2005, no pet.) (parent's absence from child's daily life and inability to support child, caused as consequence of parent's criminal conduct— i.e., incarceration—contribute to endangering conduct).

Mother argues that there was "scant evidence" to support the finding under (D). But this ignores the evidence of Mother's own failure to properly protect Laurel from Mother's abusive partner. While the evidence of this fact was not voluminous, it was undisputed that the children were removed because of that abuse and that Mother herself faced criminal charges related to that incident. *See In re E.J.*, 2023 WL 8043686, at *9 (holding that inappropriate, abusive, or unlawful conduct by parent can create environment that endangers physical and emotional well-being of children as required for termination under subsection (D)).

Mother argues that the children were removed from Father while he had possession as provided for under the 2019 order, but the evidence demonstrates that it was Mother's own criminal conduct that resulted in her loss of custody and absence from the children's lives at least until her probation ended.

Mother asserts that she was not present at the time of the children's removal from Father and that she and Father were not living in the same residence. Mother argues there was no evidence that she "was aware that the children were exposed to any danger while in the care, custody, and possession of [Father], who was appointed as the sole managing conservator of the children." She also argues that "[t]here is no evidence to support any reasonable inference that she would have and should been suspicious or aware of any potential dangers of leaving the children with their father, appointed as their managing conservator" under the 2019

order. Again, this construction of the evidence ignores the fact that it was Mother's own criminal conduct that resulted in her absence from the children's live—not the 2019 order. Furthermore, the evidence demonstrated that Mother did not attempt to stay in contact with the children in a way that would have allowed her to assess the safety or appropriateness of their homelife with Father.

Considering the entire record, including the evidence of Mother's previous DFPS history and criminal history directly implicating her treatment of Laurel, we conclude that the disputed evidence that the trial court could not have credited in favor of the finding is not so significant that the trial court could not have formed a firm belief or conviction that its findings pursuant to subsection (D) was true. *In re A.C.*, 560 S.W.3d at 361 (holding that in factual sufficiency review, appellate courts weigh "disputed evidence contrary to the finding against all the evidence favoring the finding," and "must consider whether disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding").

Because termination based on either a subsection (D) or (E) predicate finding is sufficient to invoke paragraph (M) in a future proceeding, and we have found sufficient evidence of the trial court's finding under (D), we need not separately address the sufficiency of evidence supporting the trial court's finding under paragraph (E). *See In re D.S.J.*, No. 01-17-00678-CV, 2018 WL 1003635, at *7 (Tex. App.—Houston [1st Dist.] Feb. 22, 2018, pet. denied) (mem. op.).

44

Similarly, only one predicate finding under Family Code section 161.001(b)(1) is necessary, so we need not address the additional grounds found against Mother by the trial court in its termination order. *See In re N.G.*, 577 S.W.3d at 232, 237.

We overrule Mother's first through seventh issues.

## Best Interest

Mother and Father also challenge the trial court's determination that termination of their parental rights to Laurel and Kade was in the children's best interest.

### A. Law on Best Interests

There is a strong presumption that the best interest of a child is served by keeping the child with a parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam) (citing TEX. FAM. CODE § 153.131(b)). However, prompt and permanent placement of children in a safe environment is also presumed to be in the children's best interest. TEX. FAM. CODE § 263.307(a).

The Texas Legislature has set out several factors that courts should consider in determining whether a child's parent is willing and able to provide the child with a safe environment, including factors such as the frequency and nature of out-of-home placements, the magnitude and frequency of harm to the child, the willingness of the child's family to seek out, accept, and complete counseling services and to effect positive environmental and personal changes within a

reasonable period of time, and whether the child's family demonstrates adequate parenting skills and ability to provide minimally adequate care for the child's needs. *Id.* § 263.307(b). The Supreme Court of Texas has also set out several non-exclusive factors that we should consider when determining whether the termination of a parent's rights is in the child's best interest, including (1) the child's desires; (2) the child's current and future physical and emotional needs; (3) the current and future physical and emotional danger to the child; (4) the parenting abilities of the person seeking custody; (5) the programs available to assist the person seeking custody in promoting the child's best interests; (6) the plans for the child by the person or agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent that may indicate the parent-child relationship is not proper; and (9) any excuse for acts or omissions of the parent. *In re J.W.*, 645 S.W.3d at 746 (citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)); *In re A.C.*, 394 S.W.3d 633, 641–42 (Tex. App.—Houston [1st Dist.] 2012, no pet.).

These factors are not exhaustive, and it is not necessary that DFPS prove all these factors "as a condition precedent to parental termination." *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002); *In re M.A.J.*, 612 S.W.3d 398, 410 (Tex. App.—Houston [1st Dist.] 2020, pet. denied). The absence of evidence concerning some of the factors does not preclude a factfinder from forming a firm belief or

conviction that termination is in the children's best interest. *In re A.C.*, 394 S.W.3d at 642.

The best-interest analysis may consider circumstantial evidence, subjective factors, and the totality of the evidence as well as the direct evidence. *In re Y.G.*, No. 01-22-00181-CV, 2022 WL 3362953, at *13 (Tex. App.—Houston [1st Dist.] Aug. 16, 2022, pet. denied) (mem. op.) (citing *In re B.R.*, 456 S.W.3d 612, 616 (Tex. App.—San Antonio 2015, no pet.)). "A trier of fact may measure a parent's future conduct by his past conduct and determine whether termination of parental rights is in the child's best interest." *In re B.R.*, 456 S.W.3d at 616; *see In re C.H.*, 89 S.W.3d at 28 (stating that past performance as parent "could certainly have a bearing on [parent's] fitness to provide for" child, and courts should consider prior history of child neglect in best-interest analysis). In reviewing the sufficiency of the evidence to support the trial court's finding on best interest, we are mindful that the focus in a best-interest analysis is not only on the parent's acts or omissions, but also on the nature of the relationship that the children have with the parent. *See In re E.N.C.*, 384 S.W.3d 796, 808 (Tex. 2012).

## B.     Best-Interest Factors

Reviewing the entirety of the record in light of the factors set out in *Holley* and Family Code section 263.307(b), we conclude that there was legally and

factually sufficient evidence that terminating both Mother's and Father's parental rights was in the children's best interest.

### 1. *The children's desires*

Both children expressed the desire to continue living with M.H., and the evidence at trial indicated that the children were very bonded with M.H. Nothing in the record established that either child had expressed a specific desire to have a relationship with Mother. The evidence indicated that Mother had limited or no contact with the children since 2017. There was evidence that Kade in particular expressed that he loved Father and wanted to see him. Laurel did not want to see Father. *See In re F.M.E.A.F.*, 572 S.W.3d 716, 732 (Tex. App.—Houston [14th Dist.] 2019, pet. denied) (explaining that child's love for parent is important but not controlling best interest factor); *In re M.D.M.*, 579 S.W.3d 744, 770 (Tex. App.—Houston [1st Dist.] 2019, no pet.) ("Evidence that a child is well-cared for by a foster family or a proposed adoptive placement, is bonded to the proposed placement, and has spent minimal time in the presence of the child's parent is relevant to the best interest determination and, specifically, is relevant to the child's desires.").

### 2. *Emotional and physical needs*

Father testified that he loved the children, but he acknowledged that he could not provide them with a stable home at the time of trial. There was evidence that

the children had extended family that could provide love and care for them. There was also significant testimony that M.H. provided love and stability for the children and that they were extremely bonded because she had been a part of their lives since 2017. She took the children to therapy regularly, made sure they attended school and that their educational needs were being met, and had them enrolled in extracurricular programs through the YMCA. Both caseworkers, the children's therapist, and the CASA volunteer testified that living with M.H. had resulted in a tremendous improvement in the children's behaviors and that she did a good job of dealing with the children's trauma-related challenges. By contrast, neither Father nor Mother provided any care or support to the children while the case was pending.

*3.      Emotional and physical danger*

Mother lost custody of the children in 2017 because she was not properly protective of Laurel, who was abused by Mother's then-partner. As set out above, the record also contained evidence that Father abused the children and subjected them to instability. There was no evidence of any danger in their placement with M.H.

*4.      Parental abilities*

There was limited evidence admitted concerning Mother's parenting abilities, beyond the fact that she was charged with injury to a child in connection

with her treatment of Laurel. There was evidence that she repeatedly failed to participate in services offered by DFPS and that DFPS had concluded there was reason to believe that she had endangered her children in connection with the 2017 abuse allegations. *See In re C.H.*, 89 S.W.3d at 27–28 (explaining that historical deficiencies in parenting are relevant to best-interest inquiry).

There was likewise evidence that Father had abused the children. He denied that he engaged in any abuse, but he refused to participate in any of the services required by his family plan of service. M.H. testified that she never saw Father abuse the children, but she also testified that Father "has no parenting skills, that parenting classes would be good for him, therapy. He has things he needs to work through to be a stable dad."

Rodriguez testified that the children's "regressive" behaviors were a result of their parents' poor parenting and unstable lifestyles. DFPS caseworkers both testified that they had significant concerns about both parents' abilities to provide safe and stable homes. By contrast, the evidence at trial indicated that the children were thriving in M.H.'s care and that she had the parenting skills to provide a safe and stable home for the children.

### 5. *Programs available to assist*

Neither parent demonstrated a willingness to participate in programs that would assist them in caring for their children. Mother failed to complete any of the

services provided in her family plan of service. She also failed to keep any of her meetings or appointments with Bryant or Lacewell. Father refused to participate in any of the offered DFPS services. He testified that he did not believe he would benefit from any parenting classes. M.H., however, took the children to therapy regularly and provided the support the children needed to catch up academically.

### 6. *Plans and stability*

Mother did not appear at trial, and she put forward no evidence of any plans she might have for the children. Bryant and Lacewell testified that Mother had a job and a home, but Mother never kept any appointments that she made with DFPS or CASA so that they could determine the suitability of her home. Father testified that he loved his kids and wanted to retain his parental rights. He recognized that, without employment or housing, he could not provide a stable home for the children at the time of trial. However, he testified that his sister, who had maintained contact with the children, could care for them while he worked toward obtaining employment. *See In re M.R.*, 243 S.W.3d 807, 821 (Tex. App.—Fort Worth 2007, no pet.) (holding that parent's inability to provide stable home and failure to comply with family plan of service supported finding that termination was in child's best interest); *In re J.R.W.*, No. 14-12-00850-CV, 2013 WL 507325, at *9 (Tex. App.—Houston [14th Dist.] Feb. 12, 2013, pet. denied) (mem. op.) ("A

parent who lacks stability, income, and a home is unable to provide for a child's emotional and physical needs.").

M.H., who had been a part of the children's lives since 2017 and who cared for them since their removal from Father, was willing to adopt the children if the parents' rights were terminated. She did not want to continue to provide foster care for the children if it required her on-going involvement with the children's parents and grandparents. Bryant and Lacewell, among others, testified that they believed termination of both parents' rights and adoption by M.H. was in the children's best interest. They believed that M.H. was in a position to offer the children stability, whereas neither parent was able to do so. *See In re A.G.*, No. 14-18-01089, 2019 WL 2385723, at *5 (Tex. App.—Houston [14th Dist.] June 6, 2019, pet. denied) (mem. op.) (holding that stability of proposed home environment is important consideration in determining whether termination of parental rights is in children's best interest).

### 7. *Acts or omissions and any excuses*

Both parents engaged in abuse and negligent conduct, as discussed in detail above. Mother failed to be properly protective of Laurel, resulting in DFPS finding reason to believe abuse allegations against her and criminal charges for injury to a child. Mother was absent from the children's lives beginning in 2017 up to the time of trial.

The children reported that Father physically abused them. They also stated that they moved from hotel to hotel and that they sometimes did not have enough food. Father acknowledged that he struggled with employment and in dealing with Laurel's behavior, relying on his mother for help. He testified that he still lacked a job at the time of trial because the pending criminal charges made finding employment very difficult. Father did not believe, however, that he needed parenting classes and refused to cooperate with DFPS because he did not want to signal his agreement with the allegations of abuse against him.

## C.     Analysis

Considering the factors set out above, we conclude that the evidence was sufficient to allow the trial court to form a firm belief or conviction that termination of both Mother's and Father's parental rights was in the children's best interest. *See In re E.N.C.*, 384 S.W.3d at 808; *Holley*, 544 S.W.2d at 371–72; *see also* TEX. FAM. CODE § 263.307(b).

The evidence of endangerment outlined above, including the 2017 incident of abuse against Laurel by Mother, Father's abuse of the children, and the instability in the children's lives, supports the trial court's best-interest finding. *See In re C.H.*, 89 S.W.3d at 27–28 (holding that evidence establishing predicate grounds under section 161.001(b)(1) also may be relevant to determining child's best interest); *see also* TEX. FAM. CODE § 263.307(b) (best-interest factors include

53

considerations such as frequency and severity of harm to child and parent's history of violent behavior or criminal activity, among others).

Mother lost custody of the children in 2017 following a report of abuse that DFPS found reason to believe, including conduct for which Mother faced criminal charges and served deferred adjudication community supervision. She remained absent from the children's lives following that instance and did not complete any of the services required in her family plan of service. *See* TEX. FAM. CODE § 263.307(b) (best-interest factors include parent's willingness to seek out services and demonstrate ability to provide adequate parenting skills). Neither child indicated that they had any kind of relationship with Mother.

Father was arrested for assaulting his children. He was also arrested for domestic violence against his girlfriend while this case was pending. Father refused to participate in any of the services required in his family plan of service. At the time of trial, he had not obtained employment or stable housing. *See id.*

M.H., by contrast had cared for the children since their removal from Father. The children made remarkable progress while in her care, and they were very bonded to her. While Kade expressed that he loved his Father and wanted sometimes to see him, both children expressed a desire to remain in M.H.'s care. Rodriguez and Bryant both testified that M.H. did a good job of dealing with Laurel and Kade's behaviors and had the parenting skills necessary to provide

stability for the children. M.H. testified that she was willing to adopt the children if the parents' rights were terminated.

Father argues that there is no clear and convincing evidence to support the finding that termination of his parental rights was in the children's best interest, asserting that Bryant, Lacewell, and Rodriguez "did not relate any facts that formed the basis of their opinion as to why termination was in the best interest of the children." He asserts that their testimony "amounted to little more than a recitation that the children were in foster care, that their needs were being met, that the children had bonded with [M.H.], and that [M.H.] wanted to adopt them." Father argues that the best-interest standard "does not permit termination merely because a child might be better off living elsewhere," citing *In re AH*, 414 S.W.3d 802, 807 (Tex. App.—San Antonio 2013, no pet.). This narrow view of the evidence ignores the other testimony regarding the circumstances of the children prior to their removal from his care and his criminal history, the evidence of Father's failure to engage in any of the court-ordered services, his failure to obtain employment or stable housing, and the evidence of the improvement in the children's behavior and emotional well-bring since removal. *See In re A.C.*, 394 S.W.3d at 642 (holding that absence of evidence concerning some of factors does not preclude factfinder from forming firm belief or conviction that termination is in children's best interest).

Mother argues that the fact that she is currently parenting two other children is some evidence that she has adequate parenting skills to parent Laurel and Kade. This contention, however, does not address the evidence that Mother failed to be properly protective of Laurel and failed to be involved in Laurel and Kade's lives in any meaningful way since 2017.

In light of the entire record, we conclude that the disputed evidence that the trial court could not have credited in favor of its best-interest finding is not so significant that the court could not have formed a firm belief or conviction that the finding was true. *See In re A.C.*, 560 S.W.3d at 631 (setting out factually sufficiency standard).

We overrule Mother's eighth issue and Father's fifth issue regarding sufficiency of the evidence to support the trial court's best-interest finding.

## Conservatorship Determination

In her ninth issue, Mother argues that the evidence was insufficient to overcome the fit-parent presumption and the constitutional rights afforded to her. We recognize, as Mother argues in her brief, that a parent has a constitutional right to the care, custody, and control of her child. *See In re J.W.*, 645 S.W.3d at 740. When the government seeks not only to infringe on this fundamental right, but to terminate the right altogether, such termination is considered "traumatic, permanent, and irrevocable" and "constitutes the 'death penalty' of civil cases." *In*

*re J.C.H.-P.*, 673 S.W.3d 262, 264 (Tex. App.—San Antonio 2023, no pet.) (quoting *In re D.T.*, 625 S.W.3d 62, 69 (Tex. 2021)).

However, under Family Code section 161.207, if, as in this case, the trial court terminates the parent-child relationships, "the court shall appoint a suitable, competent adult, the Department of Family and Protective Services, or a licensed child-placing agency as managing conservator of the child." TEX. FAM. CODE § 161.207(a); *In re J.D.G.*, 570 S.W.3d 839, 856 (Tex. App.—Houston [1st Dist.] 2018, pet. denied). Conservatorship determinations are reviewed for an abuse of discretion and will be reversed only if the decision is arbitrary and unreasonable. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007); *In re J.D.G.*, 570 S.W.3d at 856.

An order terminating the parent-child relationship divests a parent of legal rights and duties with respect to the child. *See* TEX. FAM. CODE § 161.206(b). Once we overrule a parent's challenge to an order terminating her parental rights, the trial court's appointment of DFPS as sole managing conservator may be considered a "consequence of the termination." *In re J.D.G.*, 570 S.W.3d at 856.

As set out above, we have overruled Mother's challenges to the order terminating her parental rights to Laurel and Kade. Because we have overruled Mother's challenges to the portion of the trial court's order terminating her parental rights, the order has divested Mother of her legal rights and duties related to Laurel and Kade. *See* TEX. FAM. CODE § 161.206(b); *In re J.D.G.*, 570 S.W.3d

at 856. Therefore, Mother does not have standing to challenge the portion of the order appointing DFPS as the children's conservator. *See In re J.D.G.*, 570 S.W.3d at 856 (affirming termination of mother's parental rights and holding that mother, who had been divested of her legal rights to child, could not challenge conservatorship determination); *see also In re L.G.R.*, 498 S.W.3d 195, 207 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) (finding no abuse of discretion in conservatorship finding in which evidence was sufficient to support termination of parental rights under clear-and-convincing evidence standard).

We overrule Mother's ninth issue.

## Conclusion

We have concluded that sufficient evidence supports the trial court's predicate findings under subsections (D) and (E) as to Father, the predicate findings under subsection (D) as to Mother, the best-interest finding as to both parents, and the order terminating both parents' rights. Finally, because the termination of Mother's parental rights is upheld, she does not have standing to challenge the designation of DFPS as the children's managing conservator.

Therefore, we affirm.

Richard Hightower
Justice

Panel consists of Justices Kelly, Hightower, and Guerra.